**MATT LAW OFFICE, PLLC**
**Terryl T. Matt, Esq.**
**Joseph F. Sherwood, Esq.**
310 East Main Street
Cut Bank, MT  59427
Telephone:  (406) 873-4833
Fax No.:     (406) 873-0744
terrylm@mattlawoffice.com
joes@mattlawoffice.com

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA, GREAT FALLS DIVISION

| | |
|---|---|
| GLACIER COUNTY REGIONAL PORT AUTHORITY<br><br>        Plaintiff,<br><br>Vs.<br><br>LAURIE ESAU, MONTANA HUMAN RIGHTS BUREAU,<br><br>        Defendant, | Case No. CV-22-81-GF-BMM-JTJ<br><br>**BRIEF IN SUPPORT OF PLAINTIFF'S RENEWED RULE 65 MOTION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER** |

COMES NOW, Glacier County Port Authority ("Port Authority"), and pursuant

to F. R. Civ. P. 65, by and through its counsel of record, Terryl T. Matt, and hereby files

1

its *Brief in Support of Renewed Rule 65 Motion for Preliminary Injunction and Temporary Restraining Order*.

## FACTUAL AND PROCEDURAL BACKGROUND

In November 2021, the Port Authority held a board meeting at the Blackfeet Community College ("BCC") in Browning, Montana, which is located within the exterior boundaries of the Blackfeet Reservation and Glacier County.  (Aff. Brenda Schilling, ¶ 3, August 26, 2022).  Before the COVID-19 pandemic, the Port Authority regularly held its board meetings in Browning.  (Aff. Schilling, ¶ 3).  During the early phases of the pandemic, the Port Authority moved its meetings off the reservation to Cut Bank, Montana, but the board members living on the reservation were unable to attend.  (Aff. Schilling, ¶¶ 4, 8).  The November 2021 meeting was the first to take place in Browning during the COVID-19 pandemic.  (Aff. Schilling, ¶ 5).  The Port Authority intends to continue holding its meetings in Browning for the foreseeable future.  (Aff. Schilling, ¶ 7).

During the 2021 Legislative Session, the Montana Legislature passed HB 702, now codified at § 49-2-312, MCA, which provides that it is an "unlawful discriminatory practice" for "a person or a governmental entity to refuse, withhold from, or deny to a person any local or state services, goods, facilities, advantages, privileges, licensing, educational opportunities, health care access, or employment opportunities based on

the person's vaccination status or whether the person has an immunity passport."

Section 49-2-312(1)(a), MCA.

At the time HB 702 was signed into law, the Blackfeet Tribal Business Council's Tribal Ordinance 121 was in effect requiring mandatory vaccination against COVID-19 for persons attending meetings in-person.  Blackfeet Tribal Ordinance 121 provides that its purpose is "to protect and promote the safety of the Tribal workforce while they carry out the duties of the Blackfeet Tribe, which requires invocation of additional procedures until the danger from the COVID-19 state of emergency has passed . . . ." Blackfeet Tribal Ordinance 121, at 2.

A non-Indian person, J.R. Myers, attempted to appear in-person for the November 2021 meeting in Browning but was not vaccinated against COVID-19.  Mr. Myers subsequently filed a complaint against the Port Authority with the Montana Human Rights Bureau (MHRB), a state regulatory agency.  MHRB has since determined the Port Authority engaged in illegal discrimination under § 49-2-312, MCA, when it required in-person attendees at the Browning meeting to show proof of vaccination.

The proceeding before the MHRB has recently been set for a contested hearing before the Office of Administrative Hearings on March 21, 2023, despite the Port Authority requesting a stay pending resolution of the jurisdictional issues pending before this Court.  *See In re: Office of Administrative Hearings Case No. 1785-2022.*

3

**ARGUMENT**

The Port Authority seeks a preliminary injunction and temporary restraining order enjoining the MHRB, a state regulatory agency, from improperly exercising its authority over the Port Authority and other non-Indian members' activities occurring on tribal lands.

A court presented with a F. R. Civ. P. 65(a) motion for a preliminary injunction must balance the following four factors: (1) the moving party's likely success on the merits of its claim; (2) whether the moving party "is likely to suffer irreparable harm in the absence of preliminary relief;" (3) "the balance of equities tips in [the moving party's] favor;" and (4) an injunction is in the public interest. *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). *See also Stuhlbarg Intl. Sales v. John D. Brush Co.*, 240 F.3d 832, 839-40 (9th Cir. 2001).

"These standards are not separate tests but the outer reaches of a single continuum." *Stuhlbarg*, 240 F.3d at 840. "The elements of the preliminary injunction test must be balanced, so that a stronger showing of one element may offset a weaker showing of another." *Lopez*, 680 F.3d at 1072.

A request for a temporary restraining order (TRO) under F.R. Civ. P. 65(b) is analyzed under the same standards as a request for a preliminary injunction. *Stuhlbarg*, 240 F.3d at 839, n.7.

4

**I.      The Port Authority is likely to succeed on the merits of its claims.**

The first factor of the preliminary injunction and TRO test requires the Court to evaluate the Port Authority's likely success on the merits of its claims.  *Lopez*, 680 F.3d at 1072.

Indian tribes are "distinct, independent political communities" exercising sovereign authority.  *United States v. Cooley*, ____ U.S. ____, 141 S. Ct. 1638, 1642 (2021).  As part of their sovereign authority, Indian tribes may "determine tribal membership, regulate domestic affairs among tribal members, and exclude others from entering tribal land."  *Cooley*, 141 S. Ct. at 1642.

The tribes' sovereignty is limited, however, due to their "incorporation into the United States," *Cooley*, 141 S. Ct. at 1642.  As such, the tribes remain subject to the plenary and exclusive authority of Congress pursuant to U.S. Const. Art. VI, cl. 2 and Art. I, § 8, cl. 3, not the authority of the individual states.  Montana's Constitution incorporates this principle, providing:

> All provisions of the enabling act of Congress (approved February 22, 1889, 25 Stat. 676), as amended and of Ordinance No. 1, appended to the Constitution of the state of Montana and approved February 22, 1889, including the agreement and declaration that *all lands owned or held by any Indian or Indian tribes shall remain under the absolute jurisdiction and control of the congress of the United States*, continue in full force and effect until revoked by the consent of the United States and the people of Montana."

Mont. Const. Art. I (emphasis added).

5

The United States Supreme Court recognizes Indian reservations as "Indian Country." *See Alaska v. Native Village of Venetie Tribal Gov't*, 522 U.S. 520, 527, 528 n. 3, 118 S. Ct. 948, 953 n. 3.  Additionally, Indian tribes retain the inherent power to exercise civil authority over the conduct of non-Indians within its reservation "when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Cooley*, 141 S. Ct. at 1643 (quoting *Montana v. United States*, 450 U.S. 544, 566, 101 S. Ct. 1245, 1258 (1981)).  In other words, "certain forms of nonmember behavior, even on non-Indian fee land, may sufficiently affect the tribe as to justify tribal oversight.  While tribes generally have no interest in regulating the conduct of nonmembers, then, they may regulate nonmember behavior that implicates tribal governance and internal relations." *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 335, 128 S. Ct. 2709 (2008).

Given these principles, MHRB, a state agency, cannot enforce § 49-2-312, MCA, absent congressional approval over tribal laws and ordinances to prohibit discrimination based on vaccine status for activities occurring on the Blackfeet Reservation.  Instead, the Tribe retains the inherent civil authority to the regulate the spread of COVID-19 on its tribal lands, a matter which directly effects tribal members' health and welfare.  *See Cooley*, 141 S. Ct. at 1643.  The spread of COVID-19 on tribal

6

lands also threatens the Tribe's economic security and political integrity, both of which require a healthy Tribal workforce to adequately function.  *See Cooley*, 141 S. Ct. at 1643.

In accordance with its inherent authority, Tribal Ordinance 121 was adopted by resolution passed by the Blackfeet Tribal Business Council.  Tribal Ordinance 121 provides that its purpose is "to protect and promote the safety of the Tribal workforce while they carry out the duties of the Blackfeet Tribe, which requires invocation of additional procedures until the danger from the COVID-19 state of emergency has passed . . . ."  Blackfeet Tribal Ordinance 121, at 2.  Tribal Ordinance 121, authorizes "[m]andatory vaccination with exceptions."  Blackfeet Tribal Ordinance 121, Ch. 7, § 6.  Notably, nothing in Tribal Ordinance 121 restricts the Tribe's ability to inquire into an individual's vaccination status.

The Port Authority was required to follow Tribal Ordinance 121, not § 49-2-312(1)(a), MCA, when it scheduled and held its board meeting located on tribal land.  Section 49-2-312(1)(a), MCA, does not apply to the Tribe on its own lands and the MHRB lacks jurisdiction to enforce the statute on tribal lands.  Montana's own constitution reaffirms this principle.  *See* Mont. Const. Art. I.  As such, the Port Authority is likely to succeed on the merits of its claim, thereby meeting the first factor of the preliminary injunction test.

**II.    The Port Authority will suffer irreparable harm as a result of MHRB requiring the Port Authority to adhere to state law on tribal lands.**

7

Under the second factor of the preliminary injunction and TRO test, the Port Authority must show it is likely to suffer irreparable harm in the absence of preliminary relief. *Lopez*, 680 F.3d at 1072.  Enforcing a state law on Indian land is "an invasion of tribal sovereignty" that "can constitute irreparable injury. *Wyandotte Nation v. Sebelius*, 443 F.3d 1247, 1255 (10th Cir. 2006).

The Port Authority cannot hold its board meetings as required by its by-laws on tribal land and comply with both state and tribal regulations as written.  If the Port Authority fails to adhere to the Blackfeet Tribe's tribal ordinances while on the reservation, it faces criminal penalties imposed by Police Officers of the Blackfeet Tribe, who are required to "execute all orders of the Court and all Ordinances and Resolutions of the Tribal Business Council, regardless of their personal opinions as to the wisdom or constitutionality of such Resolution or Ordinances . . . ."  Blackfeet Tribal Law and Order Code, ch. 6, § 3.  Without preliminary relief, MHRB will continue to enforce § 49-2-312(1)(a), MCA, on tribal lands against the Port Authority, thereby impermissibly intruding on the Tribe's sovereignty to enforce its own rules and regulations against non-members to regulate the spread of COVID-19 on its reservation.

Likewise, the Port Authority risks being subjected to a wide range of penalties as a result of MHRB's continued enforcement of § 49-2-312(1)(a), MCA.  A two-day contested case hearing has been set in the MHRB matter before the OAH.  An adverse

finding as a result of the OAH contested hearing will result in imposition of fines or other penalties against the Port Authority, which may include criminal penalties stated in § 49-2-601, MCA.

Additionally, the Port Authority faces irreparable harm to its company membership if it holds its meetings off the reservation, as board members residing on the reservation would either not be able to attend or risk greater COVID-19 exposure due to Montana's more relaxed public health laws regarding masking and vaccines. The Port Authority will also suffer irreparable damage to its relationship with the Tribe if it began regularly holding its meetings off the reservation due to the new Montana law.

### III.    The balance of equities tips in the Port Authority's favor.

The third preliminary injunction and TRO factor requires the court to balance the equities between the parties in determining whether a preliminary injunction is warranted.  *Lopez*, 680 F.3d at 1072.

Absent preliminary relief, the Port Authority will not be able to hold its board meetings at BCC as it has routinely done since before the COVID-19 pandemic, because the Port Authority cannot comply with both §49-2-312(1)(a) and Tribal Ordinance 121. MHRB, on the other hand, is not prevented from enforcing § 49-2-312(1)(a), MCA, wholesale; only with respect to tribal lands.  The balance of the equities in this case therefore tip in the Port Authority's favor.

IV.    **Granting the Port Authority's request for preliminary relief furthers the public interest.**

Finally, the court must consider whether granting a preliminary injunction is in the public interest.  *Lopez*, 680 F.3d at 1072.  "The public interest inquiry primarily addresses impact on non-parties rather than parties."  *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014).

In evaluating the public interest factor, the non-party member of the public that is most affected by allowing MHRB's continued enforcement of § 49-2-312(1)(a), MCA, is the Tribe.  In October 2021, the State of Montana Department of Public Health and Human Services reported that "[s]ince the beginning of the pandemic, Montana AI/AN [American Indian/Alaska Native] residents have been disproportionately affected by COVID-19" having suffered mortality rates "4.0 times higher than white residents in Montana."  DPHHS Office of Epidemiology and Scientific Support, *COVID-19 Associated Deaths among Montana Residents, Provisional Data January 2020-September 2021*, Oct. 22, 2021, available at https://dphhs.mt.gov/assets/publichealth/CDEpi/DiseasesAtoZ/2019-nCoV/Reports/COVIDMORTALITY2020_2021_FINAL_ADA1.pdf.

The susceptibility of Indian tribes in Montana to COVID-19's severe effects constitute a matter of essential importance in need of regulation by the Tribe.  Granting

Port Authority's request for preliminary relief allows the Tribe to continue regulating the spread of COVID-19 on its tribal lands in furtherance of the public interest.

## CONCLUSION

Having met the four factors of the preliminary injunction and TRO test, the Court should grant Port Authority's request to preliminarily enjoin the MHRB, a state regulatory agency, from improperly exercising its authority over the Port Authority and other non-Indian members' activities occurring on tribal lands.

DATED this 19th day of October, 2022     MATT LAW OFFICE, PLLC

By: /s/ Terryl T. Matt Law
     Terryl T. Matt


Attorneys for Plaintiff,
Glacier County Region Port Authority

11

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 19th day of October, 2022 a true copy of the foregoing was served:

Via ECF to the following parties:

Laurie Esau
Montana Human Rights Bureau
Walt Sullivan Building
1315 Lockey Avenue
PO Box 1728
Helena, MT. 59624-1728
Laurie.Esau@mt.gov

By: /s/ Terryl T. Matt
Matt Law Office

12