Wesley James Furlong (MT Bar No. 42771409)
NATIVE AMERICAN RIGHTS FUND
745 West 4th Avenue, Suite 502
Anchorage, AK 99501
Phone: (907) 276-0680
Fax: (907) 276-2466
wfurlong@narf.org

Mark J. Carter (*pro hac vice*)
NATIVE AMERICAN RIGHTS FUND
950 F Street NW, Suite 1050
Washington, DC 20004
Phone: (202) 785-4166
Fax: (202) 822-0068
mark.carter@narf.org

*Counsel for Intervenor-Plaintiff Blackfeet Nation*
*Additional Counsel Listed on Signature Page*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MONTANA

| | |
|---|---|
| GLACIER COUNTY REGIONAL PORT AUTHORITY,<br>   Plaintiff,<br><br> and<br><br>BLACKFEET NATION,<br>   Intervenor-Plaintiff,<br><br> v.<br><br>LAURIE ESAU, MONTANA HUMAN RIGHTS BUREAU, PETER DAMROW, DEB BROADBENT, CURTIS ALMAY, ANN BRODSKY, RICHARD BARTOS, and MONTANA HUMAN RIGHTS COMMISSION,<br>   Defendants. | Case No. 4:22-cv-00081-BMM<br><br>**AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Chief District Judge Brian M. Morris |

1

## AUTHORITY

1. This action is brought by Intervenor-Plaintiff Blackfeet Nation ("the Nation"), pursuant to Article 4 of its Treaty of 1855 with the United States of America, which provides that the Nation "shall exercise exclusive control" within its territorial boundaries. Treaty with the Blackfeet, art. 4, 11 Stat 657 (1855) ("Treaty of 1855"). "Under long-established principles of federal Indian law, treaties are enforceable in equity against third parties." *Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.*, 951 F.3d 1142, 1154 (9th Cir. 2020). This action is further supported by the right to exclude the Nation enjoys by virtue of its inherent sovereignty. Sovereigns have a significantly protectable interest in defending their jurisdictional and regulatory powers. *See Scotts Valley Band of Pomo Indians of Sugar Bowl Rancheria v. United States*, 921 F.2d 924 (9th Cir. 1990). This action is thus authorized as a measure to defend the Nation's right to exclude—pursuant to both the Treaty of 1855 and the Nation's inherent sovereignty—from encroachment by the State of Montana's attempt to enforce its laws within the Blackfeet Indian Reservation ("the Reservation").

## JURISDICTION AND VENUE

2. This case arises under the Constitution and laws of the United States, and therefore this Court has jurisdiction pursuant to 28 U.S.C. § 1331. This case further arises due to Defendants' encroachment on the Nation's treaty rights, vesting

the Court with jurisdiction pursuant to 28 U.S.C. § 1362. The Nation has suffered and will continue to suffer injury of encroachment on its sovereign authority because of the Defendants' attempt to enforce the laws of the State of Montana within the Reservation, and this Court may issue declaratory and injunctive relief to remedy those injuries. 28 U.S.C. §§ 2201, 2202. Therefore, jurisdiction is also established under Article III of the United States Constitution.

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because this action is predicated upon a federal question and a substantial part of the events or omissions giving rise to the claims alleged herein occurred, and will continue to occur, in this District.

## PARTIES

4. Intervenor-Plaintiff BLACKFEET NATION is a federally recognized Indian tribe with 17,321 enrolled members, approximately 7,000 of whom live on the Blackfeet Indian Reservation. The Reservation is in northern Montana and covers approximately 1.5 million acres. The Reservation is intersected by Glacier and Pondera Counties. The Nation asserts special solicitude standing[1] based on injuries to its sovereign authority and *parens patriae* standing on behalf of its members.

---

[1] *See Mashantucket Pequot Tribe v. Town of Ledyard*, 722 F.3d 457, 463 (2d Cir. 2013) (quoting *Massachusetts v. Envtl. Prot. Agency*, 549 U.S. 497, 520 (2007)).

3

5. Defendant LAURIE ESAU is sued in her official capacity as the Commissioner of the Montana Department of Labor and Industry (the "Department"), an administrative agency of the State of Montana. Defendant Esau is charged with the enforcement of Montana H.B. 702 through the Department's Montana Human Rights Bureau (the "Bureau") and the Montana Human Rights Commission (the "Commission").

6. Defendant MONTANA HUMAN RIGHTS BUREAU is a governmental agency of the State of Montana and a sub-agency of the Department.

7. Defendant PETER M. DAMROW, is sued in his official capacity as the Chair of the Montana Human Rights Commission.

8. Defendant DEB BROADBENT is sued in her official capacity as a Commission Member of the Montana Human Rights Commission.

9. Defendant CURTIS T. ALMAY is sued in his official capacity as a Commission Member of the Montana Human Rights Commission.

10. Defendant ANN BRODSKY is sued in her official capacity as a Commission Member of the Montana Human Rights Commission.

11. Defendant RICHARD BARTOS is sued in his official capacity as a Commission Member of the Montana Human Rights Commission.

12. Defendants Damrow, Broadbent, Almay, Brodsky, and Bartos are charged with hearing administrative appeals of complaints of alleged discrimination, including under Montana H.B. 702.

13. Defendant MONTANA HUMAN RIGHTS COMMISSION is a governmental commission of the State of Montana under the Department.

## STATEMENT OF FACTS

14. On October 17, 1855, the Nation, along with other Tribal Nations in the Rocky Mountain region, entered into a treaty with the United States to establish "[p]eace, friendship and amity" and to define the contours of the signatory sovereigns' government-to-government relationship going forward. Treaty of 1855, art. 1. The Treaty of 1855 established reservations for the respective Tribal Nations, within whose boundaries the United States promised they "shall exercise exclusive control." *Id.* art. 4.

15. On February 22, 1889, Congress admitted the State of Montana into the Union. Enabling Act of 1889, 25 Stat. 676. The Enabling Act of 1889 provided the terms upon which the State could create a constitution and state government and required the State to "disclaim all right and title to the unappropriated public lands [within the State's boundaries], and to all lands lying within said limits owned or held by any Indian or Indian tribes." *Id.* at § 4. The Enabling Act of 1889 provided

further that Indian lands would remain under the "absolute jurisdiction and control of the Congress of the United States." *Id.*

16. The Montana Constitution adopted and ratified these terms:

> All provisions of the enabling act of Congress (approved February 22, 1889, 25 Stat. 676), as amended and of Ordinance No. 1, appended to the Constitution of the state of Montana and approved February 22, 1889, including the agreement and declaration that all lands owned or held by any Indian or Indian tribes shall remain under the absolute jurisdiction and control of the congress of the United States, continue in full force and effect until revoked by the consent of the United States and the people of Montana.

Mont. Const. art. I.[2]

17. On August 30, 2022, Plaintiff Glacier County Regional Port Authority (the "Port Authority") filed a complaint in this Court against Defendants Esau and the Bureau based on an incident that allegedly occurred at the Blackfeet Community College ("Blackfeet College" or "BCC"). *See* Doc. 1.

18. Blackfeet College is located on tribal land in Browning, Montana, within the boundaries of the Reservation.

19. The Port Authority filed an amended complaint on September 6, 2022, Doc. 3, and a second amended complaint on October 19, 2022. Doc. 16.

---

[2] *See Crow Tribe of Indians v. Montana*, 650 F.2d 1104, 1111 n.5 (9th Cir. 1981), *opinion amended on denial of reh'g* 665 F.2d 1390 (9th Cir. 1982) ("This disclaimer was adopted and ratified in Montana's original constitution, Mont. Const. Ord. I, 2 (1889), and in the state's new constitution. Mont. Const. art. I (1972).").

20. Upon information and belief, the Port Authority held a board meeting at Blackfeet College in November 2021.

21. Upon information and belief, prior to the COVID-19 pandemic, the Port Authority alternated holding its board meetings in Browning (on the Reservation) and Cut Bank, Montana (off the Reservation). Upon information and belief, during the early months of the pandemic, the Port Authority held its meetings in Cut Bank.

22. Upon information and belief, the November 2021 meeting at Blackfeet College was the Port Authority's first meeting held in Browning (i.e., on the Reservation) since the start of the COVID-19 pandemic.

23. Upon information and belief, in 2021, the Montana Legislature passed H.B. 702 (codified at Mont. Code Ann. § 49-2-312 ("MCA § 49-2-312")), which prohibits discrimination based on an individual's COVID-19 vaccination status for employment or public accommodation. Specifically, H.B. 702 provides:

> [I]t is an unlawful discriminatory practice for: (a) a person or a governmental entity to refuse, withhold from, or deny to a person any local or state services, goods, facilities, advantages, privileges, licensing, educational opportunities, health care access, or employment opportunities based on the person's vaccination status or whether the person has an immunity passport[.]

Mont. Code Ann. § 49-2-312(2)(a).

24. Upon information and belief, J.R. Myers, a non-Indian who was then not vaccinated against COVID-19, attempted to attend the Port Authority's November 2021 meeting at Blackfeet College but was denied entry to the meeting.

25. Upon information and belief, Mr. Myers subsequently filed a complaint against the Port Authority with the Defendant Bureau.

26. Upon information and belief, the Defendant Bureau determined that the Port Authority illegally discriminated against Mr. Myers, per MCA § 49-2-312, by denying him entry to the November 2021 meeting at Blackfeet College based on his unvaccinated status.

27. Upon information and belief, based on the Defendant Bureau's findings, a contested case proceeding has been opened before the Department's Office of Administrative Hearings.

28. Upon information and belief, the Port Authority has sought a stay of the contested case proceedings pending its request for injunctive relief from this Court.

29. On March 9, 2021, the Blackfeet Tribal Business Council passed an amended resolution, No. 16-2018, that took effect six days later. *See* Amending Resolution 16-2018 Updating Phase 3 of the 'Blackfeet Tribe Phased Protocols' of the 'Blackfeet Tribal Emergency Operations Plan,' Blackfeet Nation, Res. 222-2021 (Mar. 15, 2018) (Intervenor-Pl.'s Ex. 1).

30. On June 16, 2021, the Blackfeet Tribal Business Council passed an amended order to ensure essential services to continue in a safe manner and to permit the opening of non-essential businesses in a safe manner for the purpose of slowing the spread of COVID-19. *See* COVID-19 Business Regulation Order, Blackfeet

Tribal Business Council (June 16, 2021). ("the Business Council Order") (Intervenor-Pl.'s Ex. 2).

31. The Business Council Order laid out several minimum regulations that businesses must take, including ensuring social distancing, providing separate operating hours for individuals particularly vulnerable to COVID-19, and providing personal protective equipment for employees. *Id.* at 3-4.

32. Educational entities, including Blackfeet College, were defined as covered businesses for purposes of the Business Council Order. *Id.* at 1

33. The Business Council Order also granted the Blackfeet Revenue Department "authority to make administrative rules to govern the regulation of businesses on the Blackfeet Reservation," including issuing administrative orders. *Id.* at 4.

34. Consistent with the Business Council Order, the Blackfeet Revenue Department issued an administrative order requiring businesses to take similar measures as described in the Business Council Order. *See* Administrative Order, Blackfeet Nation Dep't of Revenue (Mar. 19, 2021) (Intervenor-Pl.'s Ex. 3).

35. The administrative order also granted the authority for businesses to "enact stricter guidelines in accordance with CDC recommendations." *Id.* at 2.

36. Pursuant to this authority, Blackfeet College issued COVID-19 policies ("the Policies") that became effective August 24, 2021, and continued through June

30, 2022. *See* Blackfeet College (COVID-19) Policies 2021-2022, BCC (Aug. 24, 2021) (Intervenor-Pl.'s Ex. 4). In addition to requiring students and employees to be vaccinated in order to be allowed on the Blackfeet College campus, the Policies also stated that:

> Effective September 7th, 2021, community members must provide proof they are fully vaccinated to physically access the [Blackfeet College] campus. If community members do not provide proof of vaccination, [Blackfeet College] will deny access[.]

*Id.* at 2 (emphasis in original).

37. According to a study conducted by the Center for Disease Control ("CDC"), "COVID-19 incidence and mortality rates among [American Indian/Alaska Native] persons in Montana were 2.2 and 3.8 times, respectively, those among White persons. The case-fatality rate among [American Indians/Alaska Native] persons was 1.7 times that among White persons." *Morbidity and Mortality Weekly Report*, CTR. FOR DISEASE CONTROL & PREVENTION (Apr. 9, 2021), https://www.cdc.gov/mmwr/volumes/70/wr/mm7014a2.htm.

38. Another CDC study showed the beneficial effects of the Nations' COVID-19 mitigation efforts, including stay at home orders and mandated face covering The CDC reported that these efforts "were associated with a thirty-three-fold reduction in COVID-19 incidence from its peak of 6.40 cases per 1,000 residents per day on October 5 to 0.19 on November 7, 2020." *Morbidity and*

*Mortality Weekly Report*, CTR. FOR DISEASE CONTROL & PREVENTION (Apr. 9, 2021), https://www.cdc.gov/mmwr/volumes/70/wr/mm7014a3.htm.

39. The CDC has also affirmed that vaccines have been proven to greatly reduce the possibility of infection, severe illness, and death from COVID-19. *COVID Data Tracker: COVID-19 Vaccine Effectiveness Monthly Update*, CTR. FOR DISEASE CONTROL & PREVENTION (Nov. 10, 2022), https://covid.cdc.gov/covid-data-tracker/#vaccine-effectiveness.

### FIRST CAUSE OF ACTION
**(Violation of the Treaty Right to Exclude Under the Treaty of 1855)**

40. Intervenor-Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

41. Blackfeet College is located in "Indian country" as that term is defined by 18 U.S.C. § 1151 because it is located on "land within the limits of an[] Indian reservation under the jurisdiction of the United States Government." *Alaska v. Native Vill. of Venetie Tribal Gov't*, 522 U.S. 520, 526 (1998).

42. Defendants' attempt to enforce Montana law in the form of H.B. 702 against the Port Authority in a Montana administrative proceeding based on actions that allegedly took place at Blackfeet College is preempted by the Nation's right to exclude under Article 4 of the Treaty of 1855.

43. The Treaty of 1855 established a reservation for the Nation. Within the boundaries of the Reservation, the Nation was promised that it "shall exercise exclusive control." Treaty of 1855, art. 4.

44. The United States Supreme Court has repeatedly held that such "right to exclude" language in Indian treaties—including in the Treaty of 1855—vests Tribal Nations with civil jurisdiction over members and nonmembers alike and preempts exercise of jurisdiction by states. *See Williams v. Lee*, 358 U.S. 217 (1959); *McClanahan v. State Tax Comm'n of Ariz.*, 411 U.S. 164 (1973); *Kennerly v. Dist. Court of Ninth Judicial Dist. of Mont.*, 400 U.S. 423 (1971); *see also Little Horn State Bank v. Stops*, 555 P.2d 211 (Mont. 1976).

45. The Ninth Circuit has recognized this source of tribal jurisdictional authority as one of two forms of the right to exclude. Namely, a treaty-reserved right to exclude, being enshrined in a treaty ratified by Congress, is the supreme law of the land under the Supremacy Clause of the Constitution. U.S. Const. art. VI., cl. 2. Thus, "state laws that interfere with, or are contrary to [a treaty], made in pursuance of the constitution, are invalid." *Swinomish*, 951 F.3d at 1152 (internal quotations and citations omitted). The terms of a treaty right to exclude extend to non-member activity on tribal land within the reservation. *See generally id.*

46. Defendants' attempt to enforce H.B. 702 against the Port Authority violates the Nation's right to exclude under the Treaty of 1855. As the Montana Supreme Court has observed:

> The United States Supreme Court has consistently held that the Federal Government and tribes, *not states*, retain jurisdiction over territories defined as Indian Country in 18 U.S.C. § 1151(a), which includes "all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation."

*In re. Est. of Big Spring*, 255 P.3d 121, 128 (Mont. 2011) (quoting 18 U.S.C. § 1151(a)) (citing *Venetie*, 522 U.S. at 526) (emphasis added). Accordingly, H.B. 702 has no force on tribal lands within the Reservation, including at Blackfeet College.

47. The right to exclude under the Treaty of 1855 is reaffirmed by the Enabling Act of 1889, the organic document of the State of Montana. The State's admission to the Union was conditioned on the State disclaiming jurisdiction over all Indian lands and recognizing that such lands would remain under the "absolute jurisdiction and control" of the United States. Enabling Act of 1889, § 4.

48. The United States Supreme Court has interpreted this disclaimer language in similar enabling acts to mean that jurisdictional authority of the United States prior to the state's admission is retained, and that state jurisdiction is preempted where a treaty right to exclude exists. *See McClanahan*, 411 U.S. at 176, n.15.

49. Montana adopted and ratified this condition of the Enabling Act of 1889 in its constitution. Thus, the Montana Supreme Court has "held that Indian treaties are 'regarded as a part of the law of the state as much as the state's own laws and Constitution[,] [are] effective and binding on [the] state legislature[ ] . . . [and are] superior to the reserved powers of the state, including the police power.'" *Montana v. Shook*, 67 P.3d 863, 866 (Mont. 2002) (quoting *Montana v. McClure*, 268 P.2d 629, 631 (Mont. 1954)).

50. That Defendants' attempt to enforce H.B. 702 against nonmembers is irrelevant, as the treaty right to exclude extends to nonmembers on tribal lands within the boundaries of the reservation. *See Swinomish*, 951 F.3d at 1160 (recognizing that Tribal Nations may enforce treaty-reserved rights to exclude against non-Indians).

51. The Nation's authority to protect the health and welfare of members and nonmembers alike is undermined by Defendants' enforcement of H.B. 702 against entities operating on tribal lands within the Reservation. Accordingly, H.B. 702 "interfere[s] with," *id.* at 1152, the Nation's inherent sovereign authority over tribal lands within its Reservation.

52. The United States Supreme Court has held state jurisdiction is preempted by a treaty right to exclude without courts needing to determine whether state jurisdiction infringes upon tribal self-government, as set forth in *Williams*. *McClanahan*, 411 U.S at 180 (discussing *Kennerly*, 400 U.S. at 423). Defendants'

enforcement of H.B. 702 within the Reservation "conflicts with" the Nation's right to exclude under the Treaty of 1855, thus H.B. 702 "simply must give way." *Swinomish*, 951 F.3d at 1152.

53. Defendants' attempt to enforce H.B. 702 under the facts of this case contravene and are preempted by the Treaty of 1855, and, by extension, the Supremacy Clause of the United States. The inevitable conclusion is that H.B. 702 can have no force or effect within the Reservation.

## SECOND CAUSE OF ACTION
### (Inherent Sovereign Right to Exclude and Regulate Conduct)

54. Intervenor-Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

55. Defendants' attempt to enforce H.B. 702 within the boundaries of the Reservation also violates the Nation's right to exclude and right to regulate the conduct of non-Indians and non-tribal members by virtue of its inherent sovereignty.

56. The United States Supreme Court and the Ninth Circuit have repeatedly affirmed Tribal Nations' inherent right to exclude. As the Ninth Circuit has stated:

> Under federal common law, Indian tribes have the right to exclude non-Indians and non-tribal members from their lands, and the commensurate right to grant admission to, or use of, their lands on such terms as the tribes see fit to impose. "[A] hallmark of Indian sovereignty is the power to exclude non-Indians from Indian lands[.]"

*Swinomish*, 951 F.3d at 1153 (quoting *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 141 (1982)); *Window Rock Unified Sch. Dist. v. Reeves*, 861 F.3d 894, 899 (9th

Cir. 2017), *as amended* (Aug. 3, 2017) ("The Supreme Court has long recognized that Indian tribes have sovereign powers, including the power to exclude non-tribal members from tribal land."), *cert. denied* 138 S. Ct. 648 (2018).

57. Likewise, state laws that would interfere with a Tribal Nation's inherent right to exclude are preempted as a matter of federal law. As federal common law, Tribal Nations' inherent right to exclude, just as the treaty right to exclude, is the Supreme law of the land. *Swinomish*, 951 F.3d at 1152. Thus, where state law conflicts, the state law "simply must give way." *Id*.

58. The inherent right to exclude vests Tribal Nations with authority to regulate conduct on tribal lands. "Tribes possess inherent sovereign authority '[t]o determine who may enter the reservation; to define the conditions upon which they may enter; to prescribe rules of conduct; [and] to expel those who enter the reservation without proper authority.'" *Swinomish*, 951 F.3d at 1153 (quoting *Quechan Tribe of Indians v. Rowe*, 531 F.2d 408, 411 (9th Cir. 1976)).

59. Moreover, the United States Supreme Court has clearly and consistently held that even on non-Indian fee land, Tribal Nations retain the inherent sovereign authority to regulate non-Indian "conduct [that] threatens or has some direct effect on . . . the health or welfare of the tribe." *United States v. Cooley*, 141 S. Ct. 1638, 1641 (2021) (quoting *Montana v. United States*, 450 U.S. 544, 566 (1981).

60. In accordance with Blackfeet College policy—pursuant to delegated authority by the Nation's Tribal Business Council—individuals were required to be vaccinated against COVID-19 in order to access the Blackfeet College campus at the time of the Port Authority meeting in November 2021. This regulatory exercise comports perfectly with the Nation's clear authority to regulate the conduct of tribal and non-tribal members, especially when the regulated conduct—here, an attempt to attend an in-person meeting while unvaccinated against COVID-19—threatens the health and welfare of the Nation.

61. The Nation exercised its inherent sovereign authority to protect the health and welfare of the Nation and its members by sanctioning businesses, including Blackfeet College, to require individuals to be vaccinated against a deadly, viral disease. The Port Authority's compliance with Blackfeet College's COVID-19 vaccination requirement by denying Mr. Meyer's entry to its November 2021 meeting was in fulfillment of the Nation's exercise of its inherent right to exclude anyone who failed to conform with COVID-19 vaccination requirements.

62. The State's attempt to enforce H.B. 702 within the boundaries of the Reservation violates the Nation's right to exclude and to regulate the conduct of non-members by virtue of its inherent sovereign authority, as well-established by the Supreme Court and the Ninth Circuit.

**RELIEF**

WHEREFORE, Intervenor-Plaintiff prays that the Court enter judgment in its favor as follows:

1. Declare jurisdiction over this matter;

2. Declare that Defendant's attempt to enforce H.B. 702 under the facts of this case violates Article 4 of the Treaty of 1855, and that it thus can have no force or effect of law under Article IV, Clause 2 of the United States Constitution;

3. Declare that Defendants' attempt to enforce H.B. 702 under the facts of this case violates the Nation's right to exclude and right to regulate the conduct of non-Indians and non-tribal members by virtue of its inherent sovereignty as recognized by federal common law;

4. Grant permanent injunctive relief by ordering Defendants to cease and dismiss all administrative proceedings against the Port Authority;

5. Grant permanent injunctive relief ordering Defendants to make no further attempts to enforce H.B. 702 within the Blackfeet Indian Reservation; and

6. Grant any further relief which may in the discretion of the Court be necessary and proper to ensure that Defendants take no other action to apply H.B. 702 within the Blackfeet Indian Reservation.

DATED this 20th day of December, 2022.

*/s/ Wesley James Furlong*
*/s/ Mark J. Carter*
Wesley James Furlong (MT Bar No. 42771409)

Mark J. Carter (*pro hac vice*)
NATIVE AMERICAN RIGHTS FUND

*/s/ Jason Searle*
*/s/ Matthew L. Campbell*
Jason Searle (*pro hac vice*)
Matthew L. Campbell (*pro hac vice*)
NATIVE AMERICAN RIGHTS FUND
1506 Broadway
Boulder, CO 80302
Phone: (303) 447-8760
Fax: (303) 443-7776
searle@narf.org
mcampbell@narf.org

*Counsel for Intervenor-Plaintiff Blackfeet Nation*